IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | No. 21 CR 408 |
| v. | Judge John F. Kness |
| CARRIE M. AUSTIN *et al.* | |
| Defendants. | |

**MEMORANDUM OPINION AND ORDER**

Defendant Carrie M. Austin, a former Chicago alderman, stands charged by indictment with conspiracy and bribery related to various home improvements that, it is alleged, she accepted in exchange for undertaking certain acts in her official capacity. Defendant is 76 years old and suffers from serious health problems, including chronic obstructive pulmonary disease (COPD), various heart ailments, and cancer. Defendant maintains that these health conditions, in particular her COPD, are so severe that she is not physically fit for trial and asks that her November 3, 2025 trial be postponed indefinitely. Insisting that various protective measures could allay Defendant's concerns, the United States opposes any continuance of the trial.

To develop a sufficient record, the parties produced reports from three separate medical experts: one selected by each party, and a third agreed to by both parties. The first two experts disagreed: Defendant's expert opined that she is not fit for trial, and the Government's expert opined that she is. After having been provided with an

agreed joint statement setting forth the contours of a trial and outlining the standard for determining the fitness of a defendant for trial, the third expert, Dr. Russell opined that Defendant is, in fact, not fit for trial. Following that report, and at the Government's request (opposed by Defendant), the Court conducted an evidentiary hearing at which Dr. Russell testified. Both parties then submitted posthearing briefs in which they drew different conclusions about the legal effect of Dr. Russell's testimony.

For the reasons that follow, the Court finds that Defendant is not fit for trial. Although the issue is close, requiring Defendant to proceed to trial would present an unacceptable risk to her health. In addition, Defendant's present condition, which is unlikely to improve, is compromised such that her ability to participate in trial—not only in the courtroom, but also in necessary trial preparation and conferences with her counsel—would be materially impeded. Accordingly, Defendant's motion to sever and to be declared medically unfit for trial (Dkt. 47 and 133) is granted.

**I. BACKGROUND**

Defendant Carrie Austin has asked the Court to sever her from the scheduled November 2025 joint trial with her co-Defendant and to be declared medically unfit for trial. (*See* Dkt. 47 at 1.) Defendant brings her motion under Rule 12 and Rule 14(a) of the Federal Rules of Criminal Procedure and the Fifth and Sixth Amendments. In support, Defendant cites the many chronic health conditions from which she suffers, including, most pertinently, chronic obstructive pulmonary disease (known more familiarly by the initialism "COPD"). (*See id.* ¶ 6.) Defendant's illnesses

go well beyond COPD and include heart problems (two aortic dissections, bypass surgery, and coronary artery disease, along with other heart problems), breast cancer (including a double mastectomy), and various gastrointestinal conditions (surgery to place and remove an ileostomy, multiple incidents of gastric bleeding, one of which had to be surgically treated, and gastric bypass surgery). (*Id.* at ¶ 3–6.) On December 15, 2021, Defendant's pulmonary conditions caused her to collapse and become unresponsive at a City Council meeting, requiring her to be rushed to the hospital. (*Id.* at ¶ 8.)

In the light of these medical conditions and history, Defendant's doctors advised her to rest, avoid stress, and use portable oxygen daily. (*Id.* at ¶ 11.) Despite using portable oxygen, Defendant struggles to walk even short distances and to participate in meetings with her attorneys for more than a few hours. (*Id.* at ¶ 12.) Defendant's counsel has represented that the state of Defendant's health, as corroborated by her medical records, has made it "nearly impossible to consult with her in any meaningful fashion consistent with the requirements of the Sixth Amendment." (*Id.* at ¶ 14–15; *see* Dkt. 47-1.)

Defendant's motion is opposed by the United States, which contends that Defendant has failed to demonstrate the necessary "substantial danger to her life or health." (Dkt. 51 at 8–10.) According to the Government, Defendant's assertion of enfeeblement is belied by the record of her engaging in strenuous activities such as attending city council meetings, running errands, and spending time with her grandchildren. (Dkt. 51 at 8–10.) Available remedial measures at trial, the

3

progressive nature of Defendant's health conditions, the seriousness of the charges against her, and the high bar for declaring a defendant unfit to stand trial, according to the prosecutor, all weigh in favor of denying Defendant's motion. (*Id.* at 11–14.)

Upon request, the Court permitted Defendant to engage an expert witness to opine on her health and fitness. (Dkt. 57 at ¶ 2–3; Dkt. 133 at ¶ 3–4.) Defendant retained Dr. Panagis Galiatsatos, MD, who examined Defendant's medical records for the period 2020–2024 (Dr. Galiatsatos did not personally examine Defendant). (Dkt. 134-1 at 2). Dr. Galiatsatos noted that Defendant's COPD was of particular concern because of its severe impact on her lung function as measured by a CT scan, 6-minute walk test, and a modified Medical Research Council (mMRC) Dyspnea Score of +3: all of which produced results that have "a significant association with mortality" and greatly restrict her physical mobility. (*Id.* at 4.) Based on the Defendant's severe COPD alongside her medical history as a whole, Dr. Galiatsatos opined that Defendant is "physically unfit for trial and the stresses of withstanding trial. In brief, her cardiopulmonary issues will not permit her to cooperate in such affairs." (Dkt. 134-1 at 2.)

Without objection from Defendant, the United States retained its own expert to review Defendant's medical records and opine on her fitness for trial. (Dkt. 133 at ¶ 6; *see* Dkt 140; 140-1.) Dr. Jeffrey Huml, a board-certified pulmonologist, conducted an independent review of Defendant's medical records (Dkt. 140 at 3–4) and first noted that he agreed with "much of Dr. Galiatsatos's interpretations of the available records, including with respect to Defendant's comorbidities and likely lifespan."

4

(Dkt. 140-1 at 3.) As to Defendant's fitness for trial, however, Dr. Huml found that "little in the record[] indicates that [Defendant] will be unable to sit through daily trial proceedings and meet with her counsel." (*Id.*) Dr. Huml opined that, as Defendant would be seated during trial, she would not be "required to exert herself physically"—which is the primary trigger of her COPD. (*Id.* at 4.) And Defendant's other medical conditions, "while meaningful, principally impact her capacity to be physically active, and not necessarily her capacity to withstand stressful situations." (*Id.*) Given that Defendant's conditions are "not likely to improve with time," Dr. Huml implied that the trial should take place sooner rather than later. (*Id.*)

In an effort to develop a more concrete record in the face of these contradictory opinions, the Court directed the parties to confer and, if possible, retain a "Court-appointed forensic expert to prepare a report on the status of Defendant Austin's fitness for trial." (Dkt. 144.) Following that process, and upon the parties' request, the Court appointed Dr. Susan Russell, MD. (Dkt. 145 at 2–3; Dkt. 146.)

After Dr. Russell was engaged, the parties provided her with a joint statement ("Joint Statement") explaining the basics of the trial. (*See* Dkt. 152-1). Specifically, the parties detailed the preparation that would be required for trial (including Defendant traveling to meet with counsel and going over voluminous evidence in a series of "lengthy, stressful meetings") and noted that Defendant would need to attend in-person pretrial conferences of at least several hours in the lead up to trial. (*See id.* at 1–2.) As for the trial itself, the Joint Statement detailed the process of jury selection, presenting evidence, cross examination, and the Government's burden to

5

prove Defendant's guilt beyond a reasonable doubt. (*Id.*) The parties specified what would be required of Ms. Austin throughout the trial, which is projected to last two to three weeks. (*Id.*) Each week would be compromised of four to five days of trial that last the entire business day, with only two short breaks plus a break for lunch, along with Defendant needing to meet with her lawyers for thirty minutes to two hours per day after the trial day concludes. (*Id.* at 1.) Finally, the Joint Statement explained that finding a Defendant unfit for trial is left to the Court's discretion, but that the Court considers a range of factors and "a defendant seeking to be declared physically unfit for trial should establish that the trial will have an adverse effect on the defendant's health that is serious and out of the ordinary and will pose a danger to her life or health." (*Id.* at 2.)

Once she had been provided with the parties' Joint Statement, Dr. Russell examined Defendant, reviewed her medical history, and prepared a report for the Court finding that Defendant is not fit to stand trial. (*See* Dkt. 152 at 2–4.) Dr. Russell found, among other things, that the Defendant's problems with shortness of breath had progressively increased since 2022, and that she had a Body mass index, airflow Obstruction, Dyspnea, and Exercise (BODE) Index score of 6, which estimates a 57% four-year survival rate. (Dkt. 153 at 3.) Overall, Dr. Russell concluded that Defendant was not medically fit to stand trial because her "pulmonary dysfunction prevents her from participating in trial." (*Id.*) More specifically, Defendant would require multiple oxygen tanks per day, could not use her nebulizer in court, and, Dr. Russell

6

anticipated, would have trouble with traveling to and from the courthouse and to meet with her attorneys. (*Id.*)

At the Government's request (opposed by Defendant), the Court held an evidentiary hearing to address the issues raised in Dr. Russell's report. (*See* Dkt. 163.) After the hearing, both sides filed posthearing briefs, with the Government arguing that Dr. Russell made fatal concessions about Defendant's ability to participate in a modified trial, and Defendant continuing to maintain that Dr. Russell's concessions do not impact her ultimate conclusion that Defendant is unfit for trial. (*See generally* Dkt. 165; Dkt. 167.) Those respective contentions are addressed below.

## II. STANDARD OF REVIEW[1]

When a defendant is physically unfit, a trial and conviction "in that circumstance would violate the due process clause." *Carroll v. Kaplan*, No. 93-cv-6328, 1993 WL 469908, at *4 (N.D. Ill. Nov. 10, 1993). A defendant who seeks to obtain a delay of a criminal trial due to physical incompetency must show that (1) the trial will have "an adverse effect" on her health; and (2) the trial's adverse effect will "be serious and out of the ordinary" and "pose a substantial danger to a defendant's life or health." *See United States v. Brown*, 821 F.2d 986, 988 (4th Cir. 1987); *United States v. Zannino*, 895 F.2d 1, 13–14 (1st Cir. 1990). A mere possibility of an adverse

---

[1] Neither the parties nor this Court have been able to locate any Seventh Circuit cases that address the standard defendants must satisfy to be declared physically unfit for trial. Accordingly, the parties and the Court have turned to relevant authority from other circuits for its persuasive value.

7

effect "on a party's wellbeing is not enough to warrant a postponement." *Zannino*, 895 F.2d at 13.

It is also necessary to consider a defendant's "right to assist in [her] own defense." *Id.* at 14. If a defendant's health is in question, courts should evaluate "the degree to which a defendant's health might impair his participation in his defense, especially his right to be present at trial, to testify on his own behalf, and to confront adverse witnesses." *Brown*, 821 F.2d at 988. As the Supreme Court has explained, a defendant in a criminal case "must often consult with his attorney during the trial," and that right is protected by the Sixth Amendment. *See Geders v. United States*, 425 U.S. 80, 88, 92 (1976). Whether a defendant's physical condition is so poor as to deprive her of her Sixth Amendment rights and thus "require a continuance or severance" is a decision "reserved to the sound discretion of the district Judge." *See Bernstein v. Travia*, 495 F.2d 1180, 1182 (2d Cir. 1974).

As the First Circuit has noted, when a "colorable claim of medical dangerousness is lodged and contested, the court must carefully investigate the situation" and consider the medical evidence as well as "the defendant's activities (in the courtroom and outside of it), the steps defendant is taking (or neglecting to take) to improve [her] health, and the measures which can feasibly be implemented to reduce medical risks." *Zannino*, 895 F.2d at 14. Once the level of dangerousness is established, the judge must "weigh the foreseeable risks against the demonstrable public interest, taking into account factors such as the severity of the charges and the

8

extent of the Government's interest in trying the defendant. If the perceived risks overbalance the perceived benefits, a continuance must be granted." *Id.*

### III. DISCUSSION

#### A. The Risk to Defendant's Health

Dr. Russell's report catalogues, in significant detail, Defendant's complicated medical history. Dr. Russell first notes that Defendant's medical history indicates a number of medical problems, including COPD, which is "complicated by chronic hypoxic respiratory failure on home oxygen." (*Id.* at 2.) Defendant's respiratory function is also impacted by her "heart failure with preserved ejection fraction (HFpEF), coronary artery disease with prior bypass surgery, hypertension, aortic dissection with prior repair, multiple deep vein thromboses (DVTs), breast cancer requiring surgery, and prior pulmonary embolism." (*Id.*) Despite proper treatment for these conditions and for her COPD, Defendant's lung function has declined over time due to the progressive nature of COPD. (*See id.* at 3.) Defendant presently meets the criteria for Class 4 American Medical Association (AMA) pulmonary dysfunction: the most severe COPD classification possible. (*Id.*)

Defendant presently requires three liters of oxygen via nasal cannula per day when she is at rest and four when she exerts herself. (*Id.* at 2.) Frequent breaks are necessary to manage Defendant's shortness of breath during exertion whether through a shower chair, motorized scooter, or simply resting in a chair after walking in her home. (*Id.*) Due to Defendant's impaired lung function, many day-to-day

9

activities require great exertion, including bathing, getting dressed, and walking short distances. (*Id.*)

Based on Defendant's physical condition and the Joint Statement (the trial description provided by the parties), Dr. Russell concluded that "Defendant's pulmonary dysfunction prevents her from participating in the trial as it is described in the provided documentation." (*Id.* at 3.) Dr. Russell identified Defendant's need for additional oxygen tanks, which she is unable to transport without assistance, and her need to use a nebulizer, which Dr. Russell opined could not be used in a courtroom setting, as the primary hurdles before Defendant. (*See id.*)

In the Joint Statement, the parties agreed that, during the trial, there would "likely be one or two limited 10-to-15-minute breaks, in addition to a lunch break each day." (Dkt. 152-1 at 2.) Trial days were described as "likely last[ing] a full business day, four to five weekdays each week." (*Id.*) The Joint Statement did not discuss the possibility of the Defendant storing oxygen tanks in the courtroom, using a scooter in lieu of walking, or the possibility of having medical professionals nearby to step in if something went awry. (*See generally id.*)

At the evidentiary hearing held on May 13, 2025, however, the Government suggested several modifications to the trial that were either not mentioned in or contradicted by the Joint Statement and asked Dr. Russell how they would affect her analysis.² (*See* Dkt. 169 at 29–31.) The Government began by asking Dr. Russell if

---

² Neither party has so much as suggested any doubt as to Dr. Russell's credibility. None would be persuasive in any event: Dr. Russell, whose professional qualifications are compelling and who is the only medical professional who actually examined Defendant in

10

there were measures that could be taken to reduce the risk of Defendant experiencing COPD exacerbation, which Dr. Russell noted was the worst pulmonary risk Defendant would face at trial. (*See id.* at 26, 29.) When Dr. Russell responded in the affirmative, the Government proposed several such measures. (*Id.* at 29.) The first included storing extra oxygen tanks in the courtroom so there would be no risk of running out and allowing Defendant breaks to access her nebulizer on an as needed basis, both of which Dr. Russell affirmed would reduce the risk to Defendant. (*Id.*) Dr. Russell also confirmed, in response to the Government's questioning, that using a scooter or wheelchair to attend court, having shorter trials or taking days off, and having medical professionals nearby would all reduce the risk trial poses to Defendant's pulmonary health. (*Id.* at 29–31.) The Government asked, finally, whether if all those measures were taken, there would still be "a substantial danger to Defendant's health." (*Id.* at 31.) Dr. Russell responded, "I think there's still an increased risk, but I think it would not be substantial." (*Id.*)

During her examination by Defendant's counsel, Dr. Russell clarified that she had not changed her opinion, and that she still maintained that Defendant was not fit for trial "as [it was] described to me [in the written description provided by the parties]." (*Id.* at 32.) Dr. Russell also clarified that she continued to "stand by" her opinion despite the Government's questions, and that COPD exacerbation at trial remained a risk that the Defendant would face. (*Id.* at 44–45.)

---

person, testified forthrightly, gave no indication of evasion or uncertainty, and exhibited no bias for or against either side.

11

Upon consideration of the totality of the facts summarized above, the Court finds that a trial would have an "an adverse effect" on Defendant's health. Merely the act of showering or walking from room to room in her house is strenuous for Defendant, so there is no doubt that traveling to and from the courthouse, sitting in trial all day, and traveling to meet with her attorneys at night, even with the aid of a scooter, will have an "adverse effect" on her health compared to resting at home as she currently does most of the time. (*See* Dkt. 153 at 2–3.) Moreover, the serious, progressive, and incurable nature of Defendant's condition obviates the possibility of overall improvement in her health and establishes that there is more than a "mere possibility" that trial will have an adverse effect on her health. *See Zannino*, 895 F.2d at 13. The only question, then, is whether the adverse effect of trial will "be serious and out of the ordinary" and "pose a substantial danger to [the] defendant's life or health." *See Brown*, 821 F.2d at 988.

Both sides dispute the significance of Dr. Russell's statement that Defendant faces an "increased" but "not substantial" risk if trial were to be conducted with the Government's proposed modifications. (*See generally* Dkt. 165 and 167.) On the Government's account, this is a fatal concession; on Defendant's account, it is irrelevant because Dr. Russell later affirmed that she stood by her opinion. (*See* Dkt. 165 at 1–3; Dkt. 167 at 1–2.) "Substantial" as a material adjective, however, does not come from any statute but instead describes a judicial inquiry, fundamentally dependent on context, that aims to assess the seriousness of the risk to a defendant's health. *See, e.g.*, *Brown*, 821 F.2d at 988; *Latham v. Crofters, Inc.*, 492 F.2d 913, 915

12

(4th Cir. 1974) (a defendant need only show "a substantial possibility . . . that the requisite danger existed" to satisfy the "substantial danger" standard).

As a linguistic matter, "substantial" does not set a hard and fast line, nor is it as easily quantifiable as the Government suggests. As used in precedent, the word provides a circumstance-dependent rough guide to assess whether the risk to a defendant's health goes beyond the trivial and places her health in significant enough jeopardy as to compel an abeyed trial. Indeed, that understanding is echoed by the language of the Joint Statement, which explained to Dr. Russell that "a defendant seeking to be declared physically unfit for trial should establish that the trial will have an adverse effect on the defendant's health that is serious and out of the ordinary and will pose a danger to her life or health." (Dkt. 152-1 at 3.) In the Court's view, an adverse effect that is "serious and out of the ordinary" is materially indistinguishable from a risk that is "substantial."

As Defendant contends, the evidence of record demonstrates a serious risk to her health should trial proceed as scheduled. At the evidentiary hearing, Dr. Russell did not waver from her opinion that the risk to Defendant's health meets the standard described in the Joint Statement, and Dr. Russell explicitly affirmed that she stood by the opinion in her report. Even with the government's proposed trial measures, Dr. Russell maintained that the risk to Defendant's precarious health would be increased by having to stand trial. Dr. Russell's statement that the risk was not "substantial" is notable, to be sure, but of greater weight is that Dr. Russell continued to emphasize, as she did in her written report, the nontrivial risk a trial would pose

13

to Defendant even with the Government's proposed trial modifications. (*See* Dkt. 153 at 3; Dkt. 169 at 26.)

More broadly, it bears emphasis that Dr. Russell's testimony during the evidentiary hearing was based on hypothetical conditions with which she had not been previously presented. At the Court's request, the parties prepared the Joint Statement and provided it to Dr. Russell in advance of her work on this case precisely so that she could reach a considered and reliable conclusion based on clear parameters. That Dr. Russell considered the Government's proffered conditions and allowed that they could mitigate the risk to a degree only enhanced her credibility and rendered the reaffirmance of her ultimate opinion more compelling.

In the end, the question is close: two medical experts say Defendant is not fit for trial, and another says she is. Compounding the issue is that there may be remedial trial measures that could, to a degree, mitigate the risk to Defendant. But despite the closeness of the question, and for the reasons provided above, the evidence compels a finding that Defendant is not fit to stand trial.

### B. Defendant's Ability to Participate in Her Defense

Assessing Defendant's fitness for trial is not limited to considering the risk to her health: another factor is her "right to assist in [her] own defense." *Zannino*, 895 F.2d at 14. This factor includes such considerations as Defendant's ability to assist her attorneys in pretrial preparation, to meet with her attorneys each day after the conclusion of trial, and the overall additional strain these activities would impose on Defendant.

14

As Defendant points out, the Government's proposed trial modifications do not adequately take these considerations into account. (*See* Dkt. 169 at 29–31.) Even without the stress of trial, Defendant is able to meet with her attorneys only for an hour or two at a time, and her counsel maintains that Defendant has been "physically incapable of assisting [counsel] in the defense." (Dkt. 47 ¶ 12; Dkt. 167 at 4 n.6.) Meeting with counsel for hours after trial in addition to sitting through an entire trial day and traveling between the courthouse and her attorney's office will likely prove difficult if not impossible for Defendant. If Defendant struggles to meet with her attorneys for more than a few hours when resting at home, the "off-hours and lengthy, stressful meetings" that both sides agree will be required before and during trial are unlikely to be feasible. (*See* Dkt. 152-1 at 3.)

As the Supreme Court has explained, the Sixth Amendment gives defendants not just the right to counsel, but the right to frequently consult with their attorneys, confront adverse witnesses, and otherwise meaningfully participate in their defense. *See Geders*, 425 U.S. at 88, 92; *Brown*, 821 F.2d at 988. If a defendant's health is in question, courts should evaluate "the degree to which a defendant's health might impair his participation in his defense, especially his right to be present at trial, to testify on his own behalf, and to confront adverse witnesses." *Brown*, 821 F.2d at 988. As explained above, Defendant becomes short of breath even in response to minor exercise like walking from room to room in her home, struggles to assist her attorneys in basic trial preparation, and has been advised by her doctors to avoid stressful situations. Defendant suffers from the most severe form of COPD and numerous

15

comorbidities, and has previously collapsed and needed to be revived while out in public. In sum, Defendant's overall physical condition is so poor that she cannot meaningfully participate in her own defense. *See id.*

### C. Balancing of the Interests

Having found that Defendant's health is progressively declining, she can do nothing to stop it, and the measures that could be implemented to reduce those risks are inadequate, the Court must now "weigh the foreseeable risks against the demonstrable public interest, taking into account factors such as the severity of the charges and the extent of the Government's interest in trying the Defendant. If the perceived risks overbalance the perceived benefits, a continuance must be granted." *See Zannino*, 895 F.2d at 14. These considerations compel the finding that a continuance is necessary.

Beginning with "the severity of the charges and the extent of the Government's interest in trying the defendant," *id.* at 14, Defendant is charged with conspiracy, bribery, and lying to the FBI. (*See generally* Dkt. 2.) These are, without doubt, serious charges: a public official's unlawful use of office for personal gain shakes the public's confidence in its elected representatives. Defendant suggests that the severity of her alleged corruption (a bribe roughly worth $5,000) does not equal that of other high-profile public corruption cases in this District over the past few decades. (Dkt. 167 at 3.) Perhaps: but the fact remains that the charges against Defendant are indisputably serious.[3]

---

[3] In her briefing (*e.g.*, Dkt. 167 at 3), Defendant trivializes the charges against her, implies that grand juries are not truly independent, and ruminates about the interest of the

16

For its part, the Government insists that it has a strong interest in trying Defendant and that "[a] delay of the trial is, in effect, a dismissal of the indictment—a grave outcome that would undo the work of an independent grand jury, upset the core function of the Executive, and be contrary to the public interest." (Dkt. 165 at 3.) Although the Government does not elaborate on its "core function of the Executive" argument, there is likely little more that could be said—for the task of assessing a defendant's fitness for trial is, regardless of the practical implications, a core function of the Judiciary. *See Bernstein*, 495 F.2d at 1182 (determining a defendant's fitness is a task "reserved to the sound discretion of the district Judge.") As to whether declaring Defendant not fit for trial would amount to an effective dismissal of the Indictment that would "undo the work of an independent grand jury" (Dkt. 165 at 3), the Government's argument proves too much: any not guilty verdict by a petit jury could be said to do the same. In any event, whether to seek the dismissal of an indictment is a decision that rests solely with the Executive. Finding a defendant unfit for trial does not un-return a grand jury indictment.

In a similar vein, the Government warns that granting a continuance here would "set an alarming example" and create "a new free-floating right to avoid a criminal trial." (*See* Dkt. 165 at 4, 6.) But the Government's concern, although sincere,

---

Executive in combating corruption. Defendant elsewhere describes an argument as the Government "slapping itself on the back as only the U.S. Attorney's Office in this District can do when it comes to its perpetual war on corruption in the infamous Chicago City Council." (Dkt. 57 at ¶ 1.) Such *ad hominem* trifles do little to illuminate the important and challenging issues presented by this motion; if anything, they undercut the persuasiveness of Defendant's submissions. Suffice it to say that the Court sees no evidence to support Defendant's characterization of the Government's motives.

17

is misplaced. Far from creating any new right, the decision to grant Defendant a continuance applies existing precedent to the unique circumstances present here. Indeed, every situation in which a defendant seeks a continuance based on health issues calls for a case-by-case inquiry: hence the existence of the balancing test identified above. At any rate, as with any decision of a trial-level court, today's ruling creates no binding precedent; other judges will remain free not to follow it in future cases.

Taken together, the circumstances present here call for a continuance of Defendant's trial. Although the charges are serious, and the Government's—indeed, the public's—interest in proceeding to trial is weighty, the countervailing interests are more so. For the reasons provided above, Defendant's right not to face a trial for which she is unfit outweighs the interests in proceeding to trial.

*     *     *

In the end, this decision should not be taken as an implication concerning the merits of the case or as a suggestion that Defendant is not deserving of having to face a jury of her peers. Defendant is, of course, presumed innocent of the charges against her. But by the same token, she remains under the cloud of a criminal indictment returned by a grand jury. Granting Defendant's motion means that, barring a material improvement in her health, she may indeed never face the prospect of a guilty verdict; but then again, she may also never enjoy the restorative benefit of a not guilty verdict. That the case has come to this stage reflects nothing more concrete

than a judgment that, within the bounds of due process principles, Defendant is not physically fit to stand trial.

## IV. CONCLUSION

Defendant's motion to sever (Dkt. 47, supplemented by Dkt. 133) is granted.

SO ORDERED in No. 21 CR 408.

Date: July 9, 2025

JOHN F. KNESS
United States District Judge

19